**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0000378
28-JUN-2012
09:51 AM**

NO. CAAP-11-0000378


IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
WILLIAM A. KEENER, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 09-1-2033)


SUMMARY DISPOSITION ORDER
(By: Foley, Presiding Judge, Fujise and Reifurth, JJ.)

Defendant-Appellant William A. Keener (Keener) appeals
from the April 20, 2011 Judgment entered by the Circuit Court of
the First Circuit (circuit court)[1] convicting Keener of Sexual
Assault in the Fourth Degree in violation of Hawaii Revised
Statutes (HRS) §707-733(1)(a) (1993) and sentencing him to one
year of probation with special conditions.

On appeal, Keener argues that the circuit court erred
in failing to instruct the jury on his defense of consent and
that his trial counsel was ineffective when he failed to request
that the circuit court so instruct the jury.

Evidence at trial was comprised of the testimony of the
complainant, the physician who examined her after the incident,
complainant's co-worker and two others present at the scene,
although not witnesses to the events forming the basis of the
charges. Keener presented no witnesses.

---

[1] The Honorable Glenn J. Kim presided.

The complainant testified that she accompanied a male friend and co-worker to a party held at a private house owned by a friend of her co-worker. The complainant had been to parties at this house before and understood that most, if not all the persons attending the party would be homosexual. The plan was to stay overnight at the house and her co-worker would drive her back home the following day.

Upon entering the house, the complainant immediately noticed a male, Keener, that she had not met before. She was introduced to him, specifically being told by others present that Keener was "straight" and was asked if she found Keener attractive. Not wanting to appear rude, she responded, "yes." Asked if he found complainant attractive, Keener also replied in the affirmative.

Others at the party had been drinking and "were pretty intent on having people drink." The complainant mixed her own drinks during the evening and claimed not to be "tipsy" or drunk, consuming approximately five drinks between the four hours or so between arrival and going to bed.

Some at the party made "really inappropriate comments" that made complainant uncomfortable. They asked if she and Keener "were going to get down, that they wanted to watch." As a result of these comments, complainant walked outside of the house, to the patio, with Keener. They conversed about their respective backgrounds, and complainant thought Keener "seemed like a nice enough guy."

When the host of the party came outside and suggested complainant and Keener weren't drinking enough, complainant left the house and walked to the nearby beach. Keener went with her and while on the beach, he grabbed complainant's hand without asking her. Complainant sat down on the beach and positioned herself in such a way that Keener could not hold her hand. They continued to talk and commiserate about experiences they had in common. However, when Keener made a comment about "the best relationships begin through friends" it "freaked" her out because

that was not what she was looking for. She excused herself to go to the bathroom and ran back to the house.

Complainant told her co-worker about the incident on the beach, and he told her that she needed to be forceful, that she "couldn't be nice about it or else he wouldn't get the hint." For the most part, complainant tried to avoid Keener for the rest of the evening.

Later, one of the other party members told her to sit in a chair while Keener "was going to give [her] a sexy dance." Keener was there at the time and began to approach her and begin to dance, but complainant got up and "ran away."

Still later, when complainant was outside, talking to the host about unrelated subjects, Keener joined in the conversation and complainant tried to follow her co-worker's advice to be abrasive, told Keener that his comment was grossly inaccurate, that he didn't know what he was talking about, and that he should go away. Keener left, and the host asked complainant why she was acting this way, that "he knew [she] was really nice" and "didn't have to be so mean." Complainant explained to her host that she was not interested in Keener and asked that they stop heckling her and suggesting that she and Keener get together.

As her co-worker was arranging for a bed for her to sleep in, complainant was lying down on a couch, when Keener approached her. Complainant "said, [she] was going to bed, and he said 'don't you mean our bed?' And [she] said no, it's my bed, not your bed. It's not our bed, it's my bed and [co-worker's] bed, and you're not invited, you're not welcome, nothing will happen between us tonight." With that, Keener got up and moved away.

Co-worker arranged for complainant to sleep on one of two twin beds in one of the bedrooms. One couple was already asleep on the other bed and were "really drunk and passed out." Complainant kept her t-shirt and underwear but changed from her jeans to a pair of rigid heavy cotton shorts to sleep in.

Complainant asked her co-worker to lock the door knowing he knew how to "pop" the lock.

Complainant turned on her side, away from the door, to sleep. At some point she heard the doorknob moving and assumed it was her co-worker entering the room as he was the only other person who would have reason to enter and because he knew how to jimmy the lock. She then felt the blanket being lifted and a finger inserted in her vagina. She immediately turned over to see Keener crouching down on the side of the bed. He was of the same build as Keener and wore the same t-shirt and baseball cap he had been wearing before. Complainant looked at him, waiting for him to say something, but Keener got up and left the room. Complainant did not know what to do; as the bedroom was at the back of the house, she did not know if anyone could hear her if she screamed. She felt the "smart thing to do" was to confront him when others were around. Although the couple was in the room, "they were really drunk and they were passed out" neither awoke during the incident.

Approximately five to seven minutes later, the door opened for a second time. Complainant "thought it was [co-worker] because who else was supposed to be there but him, but it wasn't him." When she felt a hand go up her shirt and touch the outside of her bra, she sat up and saw it was Keener beside her. He was wearing the same clothes he had on when he first came into the room. She hopped out of bed and ran down the hallway screaming asking where her co-worker was.

After a brief and unsuccessful search for her co-worker, she saw Keener walking into the livingroom from the hallway leading to the bedroom they had been in. She yelled at Keener, "Don't you fucking come near me again." Keener did not respond. Although her co-worker moved her to another room to try and calm her down, complainant left the room and searched for Keener, who was then outside the house and demanded that he explain himself. Keener again did not respond.

Complainant later learned that Keener left the house sometime during the night.

Keener was later charged with one count of Sexual Assault in the Second Degree, in violation of HRS §707-731(1)(a) (Supp. 2011)[2] based on sexual penetration by compulsion and one count of Sexual Assault in the Fourth Degree, a violation of HRS §707-733(1)(a)[3] based on placing his hand on her breast. The jury found Keener not guilty of the former and guilty of the latter charge.

On appeal, Keener argues the circuit court erred because it did not instruct the jury on the defense of consent. Specifically, Keener argues that it was error not to give "any instruction (1) defining consent, (2) stating that consent may be implied, and (3) directing that consent is a defense to the charges." Keener argues that, because compulsion is an element of the charge and compulsion is defined as the absence of consent, the jury should be instructed that "consent means a 'voluntary agreement or concurrence[,]' that consent 'may be express or implied,' and 'that [the jury] could not convict defendant unless it found beyond a reasonable doubt [the complainant] did not expressly or impliedly consent to sexual contact].'"

---

[2]    HRS §707-731(1)(a) provides now, as it did at the time of this offense,

§707-731 Sexual assault in the second degree. (1) A person commits the offense of sexual assault in the second degree if:

(a)    The person knowingly subjects another person to an act of sexual penetration by compulsion[.]

[3]    HRS §707-733(1)(a) provides now, as it did at the time of this offense,

§707-733 Sexual assault in the fourth degree. (1) A person commits the offense of sexual assault in the fourth degree if:

(a)    The person knowingly subjects another person to sexual contact by compulsion or causes another person to have sexual contact with the actor by compulsion[.]

5

The standard of review for jury instructions that were not objected to at trial was clarified in State v. Nichols, 111 Hawai'i 327, 141 P.3d 974 (2006), where the Hawai'i Supreme Court held that

> although as a general matter forfeited assignments of error are to be reviewed under [Hawai'i Rules of Penal Procedure (HRPP)] Rule 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, i.e., that the erroneous jury instruction was not harmless beyond a reasonable doubt.

Id. at 337, 141 P.3d at 984 (footnote omitted). Thus, the appellant must first demonstrate instructional error by rebutting the "presumption that unobjected-to jury instructions are correct[.]" Id. at 337 n.6, 141 P.3d at 984 n.6; accord State v. Eberly, 107 Hawai'i 239, 250, 112 P.3d 725, 736 (2005). If the appellant is able to rebut this presumption, the burden shifts to the State to prove that the error was harmless beyond a reasonable doubt because

> [e]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. However, error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled.

Nichols, 111 Hawai'i at 334, 141 P.3d at 981 (brackets in original omitted) (quoting State v. Gonsalves, 108 Hawai'i 289, 293, 119 P.3d 597, 601 (2005)).

In this case the jury was instructed regarding the elements of Sexual Assault in the Fourth Degree as follows:

> There are three material elements to the offense of Sexual Assault in the Fourth Degree, each of which the prosecution must prove beyond a reasonable doubt.
>
> These three elements are:
>
> (1), That on or about March 15, 2009, in the City and County of Honolulu, the defendant subjected [complainant] to an act of sexual contact, or did cause [complainant] to have sexual contact with him; and,

6

(2), That the defendant did so by compulsion; and,

(3), That as to the foregoing two elements, the defendant did so knowingly.

"Compulsion" means absent [sic] of consent, or a threat, expressed or implied, that places a person in fear of public humiliation, property damage or financial loss.

Keener did not request any instructions. He admits that the "main defense theory" was that complainant was not a credible witness and that the contacts never occurred. However, he argues that his other theory, as presented by his trial counsel, was that of consent.[4]

We are convinced that the error, if any, was harmless. The testimony of the complainant, which Keener did not dispute, was that she told Keener, "It's not our bed, it's my bed and [co-worker's] bed, and you're not invited, you're not welcome, nothing will happen between us tonight." Complainant also testified that, thereafter, Keener entered the bedroom in which complainant was sleeping not once, but twice, and on each occasion, touched complainant. Complainant testified, without contradiction, that she did not call out after the first contact because the individuals sleeping on the other bed were "passed out" and she did not know if anyone in the rest of the house

---

[4] Taking counsel's argument in context, it is not clear he was asserting that complainant consented to the contact as much as she did not prevent it:

> She makes her own drinks. There was this straight man interested in her, so she locks her door. Was there any testimony about anything about [Keener's] conduct that was so bizarre? No, there wasn't. [Keener] was not doing anything that would warrant this type of conduct from any normal person -- I've covered this before -- yet she locks the door, puts the alarm on the door, she allows the assault.

> Your [sic] know, if this second incident happened, this Assault in the Fourth Degree, if that happened -- and it didn't. If it did happen, if somebody came, it wasn't [Keener], because Harrison said he was out in the living room during this period of time. But if somebody came in and touched her, she let him do it, she let him come in. She says she watched him come in the door, come and lay down next to her and then touch her. She let it happen. She didn't reset the lock. Step by step by step, if any of that happened, and I submit it didn't, she allowed it to happen.

would hear her. Neither complainant nor Keener spoke during this first contact; there was no testimony that complainant affirmatively encouraged Keener by nonverbal means. Based on this state of the evidence, there was not a reasonable possibility that the lack of an instruction on consent contributed to the verdict.

As we conclude any error in the failure to instruct on consent was harmless, we need not reach Keener's second point on appeal, that trial counsel was ineffective when he did not request such an instruction.

Therefore, we affirm the Circuit Court of the First Circuit's April 20, 2011 Judgment.

DATED: Honolulu, Hawai'i, June 28, 2012.

On the briefs:

Audrey E. Stanley,
Deputy Public Defender,
for Defendant-Appellant.

Sonja P. McCullen,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge